

Page 1

--- F.3d ----, 2012 WL 2053572 (C.A.D.C.)
**(Cite as: 2012 WL 2053572 (C.A.D.C.))**

Only the Westlaw citation is currently available.

United States Court of Appeals,
District of Columbia Circuit.
AMERICAN PETROLEUM INSTITUTE, Petitioner
v.
ENVIRONMENTAL PROTECTION AGENCY,
Respondent
American Chemistry Council, et al., Intervenors.

No. 09–1038.
Argued Dec. 12, 2011.
Decided June 8, 2012.

**Background:** Trade association representing petroleum refineries petitioned for review of an Environmental Protection Agency (EPA) regulation deregulating many "hazardous secondary materials" under the Resource Conservation and Recovery Act (RCRA), contending that EPA erred in not including in deregulation a category of hazardous secondary material called spent refinery catalysts, which association's members generated during refining.

**Holding:** The Court of Appeals, Sentelle, Chief Judge, held that association's challenge was rendered prudentially unripe for review by EPA's new proposed regulation.

Petition held in abeyance.

West Headnotes

**[1] Federal Courts 170B ⇌12.1**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk12 Case or Controversy Requirement
                170Bk12.1 k. In General. Most Cited Cases

"Ripeness doctrine" generally deals with when a federal court can or should decide a case.

**[2] Federal Civil Procedure 170A ⇌103.2**

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing
                170Ak103.2 k. In General; Injury or Interest. Most Cited Cases

Part of ripeness doctrine is subsumed into the Article III requirement of standing, which requires a petitioner to allege, inter alia, an injury-in-fact that is imminent or certainly impending. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[3] Federal Courts 170B ⇌12.1**

170B Federal Courts
    170BI Jurisdiction and Powers in General
        170BI(A) In General
            170Bk12 Case or Controversy Requirement
                170Bk12.1 k. In General. Most Cited Cases

Even if a case is constitutionally ripe, there may be prudential reasons for refusing to exercise jurisdiction.

**[4] Administrative Law and Procedure 15A ⇌704**

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(B) Decisions and Acts Reviewable
            15Ak704 k. Finality; Ripeness. Most Cited Cases

Under the prudential ripeness doctrine in the context of agency decisionmaking, letting the administrative process run its course before binding parties to a judicial decision prevents courts from entangling themselves in abstract disagreements over administrative policies, and protects the agencies from judicial interference in an ongoing decisionmaking process.

**[5] Administrative Law and Procedure 15A**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 2053572 (C.A.D.C.)
**(Cite as: 2012 WL 2053572 (C.A.D.C.))**

🔑704

15A Administrative Law and Procedure
 15AV Judicial Review of Administrative Decisions
  15AV(B) Decisions and Acts Reviewable
   15Ak704 k. Finality; Ripeness. Most Cited Cases

Postponing review of agency decisionmaking under the prudential ripeness doctrine can conserve judicial resources, and it comports with court's theoretical role as the governmental branch of last resort.

**[6] Administrative Law and Procedure 15A 🔑704**

15A Administrative Law and Procedure
 15AV Judicial Review of Administrative Decisions
  15AV(B) Decisions and Acts Reviewable
   15Ak704 k. Finality; Ripeness. Most Cited Cases

Declining jurisdiction, under prudential ripeness doctrine, over dispute regarding agency decisionmaking while there is still time for challenging party to convince agency to alter tentative position provides agency opportunity to correct its own mistakes and to apply its expertise, potentially eliminating need for, and costs of, judicial review, but even if challenger fails to persuade agency, permitting administrative process to reach its end can at least solidify or simplify factual context and narrow legal issues at play, allowing for more intelligent resolution of any remaining claims and avoiding inefficient and unnecessary piecemeal review.

**[7] Federal Courts 170B 🔑12.1**

170B Federal Courts
 170BI Jurisdiction and Powers in General
  170BI(A) In General
   170Bk12 Case or Controversy Requirement
    170Bk12.1 k. In General. Most Cited Cases

Doctrine of prudential ripeness ensures that Article III courts make decisions only when they have to, and then, only once.

**[8] Federal Courts 170B 🔑12.1**

170B Federal Courts
 170BI Jurisdiction and Powers in General
  170BI(A) In General
   170Bk12 Case or Controversy Requirement
    170Bk12.1 k. In General. Most Cited Cases

In assessing the prudential ripeness of a case, court focuses on two aspects: the fitness of the issues for judicial decision, and the extent to which withholding a decision will cause hardship to the parties.

**[9] Administrative Law and Procedure 15A 🔑704**

15A Administrative Law and Procedure
 15AV Judicial Review of Administrative Decisions
  15AV(B) Decisions and Acts Reviewable
   15Ak704 k. Finality; Ripeness. Most Cited Cases

In the context of agency decisionmaking, prudential ripeness doctrine's fitness-for-judicial-decision requirement is primarily meant to protect the agency's interest in crystallizing its policy before that policy is subjected to judicial review and the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting.

**[10] Administrative Law and Procedure 15A 🔑704**

15A Administrative Law and Procedure
 15AV Judicial Review of Administrative Decisions
  15AV(B) Decisions and Acts Reviewable
   15Ak704 k. Finality; Ripeness. Most Cited Cases

Under the prudential ripeness doctrine in the context of agency decisionmaking, fitness of an issue for judicial review depends on whether it is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 2053572 (C.A.D.C.)
**(Cite as: 2012 WL 2053572 (C.A.D.C.))**

**[11]** Administrative Law and Procedure 15A ⚖═704

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(B) Decisions and Acts Reviewable
            15Ak704 k. Finality; Ripeness. Most Cited Cases

Under the prudential ripeness doctrine in the context of agency decisionmaking, courts decline to review tentative agency positions because doing so severely compromises the interests the ripeness doctrine protects: agency is denied full opportunity to apply its expertise and to correct errors or modify positions in the course of a proceeding, integrity of administrative process is threatened by piecemeal review of substantive underpinnings of a rule, and judicial economy is disserved because judicial review might prove unnecessary if persons seeking such review are able to convince agency to alter a tentative position.

**[12]** Environmental Law 149E ⚖═662

149E Environmental Law
    149EXIII Judicial Review or Intervention
        149Ek662 k. Ripeness. Most Cited Cases

Challenge to Environmental Protection Agency (EPA) regulation that deregulated hazardous secondary materials under RCRA was rendered prudentially unripe for review by EPA's new proposed regulation, and thus petition for review by trade association representing petroleum refineries, contending that EPA erred in not deregulating spent refinery catalysts, would be held in abeyance pending resolution of proposed regulation; proposed regulation would eliminate entirely current regulation's exclusion from definition of "solid waste" for hazardous secondary materials transferred to third party for reclamation, for which catalysts were currently ineligible, and thus waiting for resolution of proposed regulation would avoid wasting judicial resources resolving challenge to a disparate treatment that might be eliminated, and would also give association chance to convince EPA to include in its final regulation a transfer-based exclusion for all secondary hazardous materials, and these interests in favor of deferring review were not outweighed by potential financial hardship to refineries under current regulation, given refineries' limited opportunity for cost savings even if catalysts were deregulated. Resource Conservation and Recovery Act of 1976, § 1004(5), 42 U.S.C.A. § 6903(5); 40 C.F.R. §§ 261.2(a)(1), 261.2(a)(2)(i); 73 Fed.Reg. 64,668, 64,714.

**[13]** Administrative Law and Procedure 15A ⚖═704

15A Administrative Law and Procedure
    15AV Judicial Review of Administrative Decisions
        15AV(B) Decisions and Acts Reviewable
            15Ak704 k. Finality; Ripeness. Most Cited Cases

An agency can not stave off judicial review of a challenged rule simply by initiating a new proposed rulemaking that would amend the rule in a significant way.

On Petition for Review of a Final Action of the United States Environmental Protection Agency.Thomas Sayre Llewellyn argued the cause for petitioner. With him on the briefs were Harry M. Ng, Michael R. See, and Wayne J. D'Angelo.

Daniel R. Dertke, Attorney, U.S. Department of Justice, argued the cause and filed the brief for respondent.

Vincent Atriano argued the cause for movant-intervenor Gulf Chemical Metallurgical Corporation. With him on the brief was Rebekah M. VanDrake.

Before SENTELLE, Chief Judge, BROWN and GRIFFITH, Circuit Judges.

Opinion for the Court filed by Chief Judge SENTELLE.

SENTELLE, Chief Judge.
    **\*1** American Petroleum Institute (API) petitions for review of a 2008 EPA regulation deregulating many "hazardous secondary materials" under the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6901–6992k. Petitioner contends that EPA erred in not including in the deregulation a cat-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 2053572 (C.A.D.C.)
**(Cite as: 2012 WL 2053572 (C.A.D.C.))**

egory of hazardous secondary material called spent refinery catalysts, which API's members generate during the petroleum refining process. After the parties completed briefing, EPA issued a notice of proposed rulemaking that, if made final, would significantly amend EPA's 2008 decision. As a result, we deem this controversy unripe as a prudential matter and order the case held in abeyance, subject to regular reports on the status of the proposed rulemaking.

### I.
### A. Statutory and Regulatory Framework

Congress enacted RCRA in response to the "rising tide in scrap, discarded, and waste materials." *Am. Mining Congress v. EPA,* 824 F.2d 1177, 1179 (D.C.Cir.1987) (internal quotations omitted). Primary in RCRA, Congress empowered the EPA to regulate solid and hazardous waste. The statute defines "solid waste" as including "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities...." 42 U.S.C. § 6903(27). EPA's authority to regulate hazardous waste under Subtitle C of RCRA, 42 U.S.C. §§ 6921–6939f, extends to a subset of solid waste as defined in the Act. Specifically,

> (5) The term "hazardous waste" means a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—
>
>   (A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or
>
>   (B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

*Id.* § 6903(5). In furtherance of its regulatory duties under the Act, EPA has adopted regulations interpreting the statutory definitions. The regulations define a solid waste as "any discarded material" that is not excluded by variance granted under other cited sections of the regulations. 40 C.F.R. 261.2(a)(1). The regulations define "discarded material" as "any material" that is abandoned, recycled, "inherently waste-like," or a specifically identified military munition. 40 C.F.R. § 261.2(a)(2)(i). If a material fits any one of these descriptions, it is "discarded material" and therefore "solid waste" (unless EPA or Congress specifically excludes the material from that definition), and EPA has authority to regulate it under RCRA.

### B. The Regulated Materials: Spent Petroleum Refinery Catalysts

**\*2** The materials at issue in this case are catalysts used in the petroleum refining process called hydrotreating and hydrorefining catalysts. These catalysts, generally nickel, cobalt, and/or molybdenum on an alumina base, remove sulfur and nitrogen compounds from petroleum by "cracking" the hydrocarbons that make up petroleum into smaller molecules under high-temperature, high-pressure conditions. Over time, these catalysts degrade as carbon deposits or metals—in particular, vanadium—attach to them. Once fully degraded, or "spent," the catalysts are usually sent to a third party, which can either regenerate them for reuse or extract the valuable metals that have attached to the catalysts.

While useful, these catalysts carry risks. In particular, they have pyrophoric properties, *i.e.,* a tendency to spontaneously heat and ignite in air, causing fires and release of toxic chemicals. EPA therefore proposed to list hydrotreating and hydrorefining catalysts as hazardous waste in 1995. Citing the need to encourage recycling of these catalysts, API—an association whose members own or operate refineries that generate spent refinery catalysts—urged EPA in comments responding to this proposal to list the catalysts only conditionally so that spent catalysts destined for recycling would not be listed as hazardous waste. EPA declined, listing the catalysts unconditionally as hazardous waste in a final rule in 1998. Since that time, all spent catalysts, whether destined for reclamation or not, have been classified as hazardous waste subject to stringent regulations.

### C. The 2008 Rule

In 2007, EPA proposed a new rule that would change the classification of "hazardous secondary materials," which include recycled or reclaimed spent refinery catalysts. Reasoning that materials recycled under specified circumstances are not "discarded" and are therefore not "solid waste," EPA proposed to ex-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 2053572 (C.A.D.C.)
**(Cite as: 2012 WL 2053572 (C.A.D.C.))**

clude hazardous secondary materials from the definition of solid waste in two situations. First, hazardous secondary materials legitimately reclaimed under the control of their generator would be excluded from "solid waste" because EPA determined that the generator under those circumstances is treating such material as a valuable commodity rather than as a waste (the "generator-controlled exclusion"). 72 Fed.Reg. 14,172, 14,184–88. Second, hazardous secondary materials would be excluded from "solid waste" if the generator transferred the materials to a third party for legitimate reclamation under specific conditions including recordkeeping, reasonable efforts on the part of the generator to ensure legitimate reclamation by the reclaimer, financial assurances by the reclaimer, and, importantly, containment of the materials. 72 Fed.Reg. at 14,188–97. This "transfer-based exclusion" was likewise based on the idea that third-party reclamation properly carried out was not consistent with the concept of "discard."

The proposed rule would have excluded spent refinery catalysts from the definition of solid waste if they were sent to a third party for reclamation under the specific conditions set out in the proposed rule. Exclusion from "solid waste" would mean exclusion from costly Subtitle C regulation as hazardous waste. EPA issued a final rule in 2008 adopting generator-controlled and transfer-based exclusions from the definition of solid waste (the "2008 Rule"). But the final rule specifically omits spent refinery catalysts from those exclusions. EPA explained that it chose to make the catalysts ineligible for the deregulatory exclusions because of their pyrophoric properties. According to EPA, it would instead address the catalysts in a separate proposed rulemaking after seeking and considering "comment on specific conditions to address the pyrophoric properties of these hazardous secondary materials, particularly during transportation and storage prior to reclamation, in order for the Agency to determine that they are not being discarded." 73 Fed.Reg. 64,668, 64,714 (October 30, 2008). That proposed rulemaking would either finalize a spent-catalyst-specific exclusion or make the spent catalysts eligible for the general exclusions. *Id.*

**D. Procedural History and a Recent Proposed Rulemaking**
**\*3** API filed a petition for review of the 2008 Rule on January 27, 2009. The Sierra Club also petitioned for review of the 2008 Rule. On September 10, 2010, EPA entered into a settlement agreement with the Sierra Club. EPA agreed to propose, by June 30, 2011, a new rule addressing certain issues raised by the Sierra Club and to take final action on that rule by December 31, 2012.

In July 2011, soon after the close of briefing in this case, EPA published a new notice of proposed rulemaking in accordance with the settlement agreement to address the issues raised by the Sierra Club. In the proposed rule, EPA effectively revised the 2008 Rule in two relevant ways. First, spent hydrotreating and hydrorefining catalysts would now also be eligible for the generator-controlled exclusion from the definition of solid waste. 76 Fed.Reg. 44,094, 44,152 (July 22, 2011). Second, EPA proposed to eliminate altogether the transfer-based exclusion for hazardous secondary materials; those materials would again be considered solid waste—and thus hazardous waste—even if transferred to third parties for recycling and would be subject to an alternative Subtitle C standard. 76 Fed.Reg. at 44,108–10, 44,151. If this proposed rule were to become final without revision, then, spent refinery catalysts would be treated the same as other hazardous secondary materials: eligible for the generator-controlled exclusion from the definition of solid waste, but not eligible for a transfer-based exclusion, which would cease to exist.

Because EPA published the 2011 proposed rule after the parties had submitted their merits briefs, we asked the parties to address at oral argument the impact of that rule on justiciability. We now conclude that API's petition is not ripe for review.

**II.**
[1][2][3][4][5] The ripeness doctrine generally deals with when a federal court can or should decide a case. Part of the doctrine is subsumed into the Article III requirement of standing, which requires a petitioner to allege *inter alia* an injury-in-fact that is "imminent" or "certainly impending." *See* Nat'l Treasury Emps. Union v. United States, 101 F.3d 1423, 1427–28 (D.C.Cir.1996). Even if a case is "constitutionally ripe," though, there may also be "prudential reasons for refusing to exercise jurisdiction." Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 808, 123 S.Ct. 2026, 155 L.Ed.2d 1017 (2003). In the context of agency decision making, letting the administrative process run its course before binding parties to a judicial decision prevents

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 2053572 (C.A.D.C.)
**(Cite as: 2012 WL 2053572 (C.A.D.C.))**

courts from "entangling themselves in abstract disagreements over administrative policies, and ... protect[s] the agencies from judicial interference" in an ongoing decision-making process. See *Abbott Labs. v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Postponing review can also conserve judicial resources, and it "comports with our theoretical role as the governmental branch of last resort." *Nat'l Treasury Emps. Union,* 101 F.3d at 1431.

**\*4** [6][7] For instance, declining jurisdiction over a dispute while there is still time for the challenging party to "convince the agency to alter a tentative position" provides the agency "an opportunity to correct its own mistakes and to apply its expertise," potentially eliminating the need for (and costs of) judicial review. *Pub. Citizen Health Research Grp. v. FDA,* 740 F.2d 21, 30–31 (D.C.Cir.1984) (citation and internal quotation mark omitted). Even if the challenger fails to persuade the agency, permitting the administrative process to reach its end can at least solidify or simplify the factual context and narrow the legal issues at play, allowing for more intelligent resolution of any remaining claims and avoiding inefficient and unnecessary "piecemeal review." *Id.* at 30 (internal quotation marks omitted). Put simply, the doctrine of prudential ripeness ensures that Article III courts make decisions only when they have to, and then, only once. See *Devia v. NRC,* 492 F.3d 421, 424 (D.C.Cir.2007); *Pub. Citizen Health Research Grp.,* 740 F.2d at 30–31.

[8] In assessing the prudential ripeness of a case, we focus on two aspects: the "fitness of the issues for judicial decision" and the extent to which withholding a decision will cause "hardship to the parties." *Abbott Labs.,* 387 U.S. at 149. We address each aspect in turn.

**A.**

[9][10][11] The fitness requirement is primarily meant to protect "the agency's interest in crystallizing its policy before that policy is subjected to judicial review and the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting." *Wyo. Outdoor Council v. U.S. Forest Serv.,* 165 F.3d 43, 49 (D.C.Cir.1999) (internal quotation mark omitted). Among other things, then, the fitness of an issue "depends on whether it is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Atl. States Legal Found. v. EPA,* 325 F.3d 281, 284 (2003) (internal quotation marks omitted). Courts decline to review "tentative" agency positions because doing so "severely compromises the interests" the ripeness doctrine protects: "The agency is denied full opportunity to apply its expertise and to correct errors or modify positions in the course of a proceeding, the integrity of the administrative process is threatened by piecemeal review of the substantive underpinnings of a rule, and judicial economy is disserved because judicial review might prove unnecessary if persons seeking such review are able to convince the agency to alter a tentative position." See *Pub. Citizen Health Research,* 740 F.2d at 31.

[12] We would risk causing all of these problems by reviewing API's petition for review of the 2008 Rule at this time. At bottom, API argues that the spent refinery catalysts its members generate and send to reclaimers should be eligible for the 2008 Rule's transfer-based exclusion from the definition of solid waste like other hazardous secondary materials the exclusion covers. EPA responds that the pyrophoric properties of the catalysts warrant further consideration to make sure they will not be discarded during transfer. In light of the July 2011 proposed rule, though, "[i]f we do not decide [the issue] now, we may never need to." *Nat'l Treasury Emps. Union,* 101 F.3d at 1431. The proposed rule would wholly eliminate the very transfer-based exclusion of which API's members wish to take advantage. EPA's position on the advisability of a transfer-based exclusion *at all* is thus plainly a tentative one; it is proposing to eliminate the same exclusion it just created in the 2008 Rule. Also important, the new proposed rulemaking gives API a chance to convince EPA to change its mind—it provides a relevant context in which API may persuade EPA that it would be a mistake not to provide some sort of transfer-based exclusion, either for all hazardous secondary materials or at least for spent refinery catalysts. If API succeeds, this case goes away without the need for judicial review.

**\*5** If the July 2011 proposed rule is enacted as proposed, it will narrow the legal issues involved in this dispute and provide a more final and concrete setting for deciding any issues left on the table. First, because the proposed rule would lump spent refinery catalysts in with the rest of the hazardous secondary materials it covers, even API concedes that its current

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 2053572 (C.A.D.C.)
**(Cite as: 2012 WL 2053572 (C.A.D.C.))**

objection to the disparate treatment of spent refinery catalysts (and to EPA's alleged failure to allow for comment on its decision to treat the catalysts differently) would disappear along with the disparate treatment itself. It would hardly be sound stewardship of judicial resources to decide this case now on the basis of the disparate-treatment argument given that an already published proposed rule, if enacted, would dispense with the need for such an opinion in a matter of months.

Second, to the extent API and EPA dispute whether some sort of transfer-based exclusion for hazardous secondary materials is necessary to comport with the concept of "discard," that issue also is best addressed once EPA finally decides whether to eliminate the transfer-based exclusion it adopted in the 2008 Rule. Indeed, in the only rule before us now, the 2008 Rule, EPA actually *adopted* a transfer-based exclusion (and then "deferred" until a later date the question whether spent catalysts should be eligible for that exclusion or a different one). In this context, it makes little sense to nevertheless pigeonhole EPA into *rebutting* API by arguing that a transfer-based exclusion is *not* required. If we withhold review of this petition as prudentially unripe, we need not address the issue in its current indeterminate form. In the ongoing rulemaking, EPA could change its mind and keep the transfer-based exclusion, in which case the issue goes away; or, if EPA stays the course and abolishes the transfer-based exclusion, the dispute will become concrete and straightforward. API can then argue that a transfer-based exclusion is required, and EPA can respond—based on whatever explanation it provides in the record of the then-final rule—that treating hazardous secondary materials sent for reclamation as "discarded" is a permissible interpretation of its authority to regulate "solid waste" under RCRA. Either way, waiting to resolve this case allows EPA to apply its expertise and correct any errors, preserves the integrity of the administrative process, and prevents piecemeal and unnecessary judicial review.

[13] All of this is not to say an agency can stave off judicial review of a challenged rule simply by initiating a new proposed rulemaking that would amend the rule in a significant way. If that were true, a savvy agency could perpetually dodge review. *Cf. Am. Petroleum Institute,* 906 F.2d at 739–40 ("If the possibility of unforeseen amendments were sufficient to render an otherwise fit challenge unripe, review could be deferred indefinitely.").

That risk of agency abuse is not present here. To begin with, the 2011 proposed rule is clearly not some non-substantive, thinly veiled attempt to evade review; it is a complete reversal of course on EPA's part that, if adopted, would necessitate substantively different legal analysis and would likely moot the analysis we could undertake if deciding the case now. Moreover, the happening or timing of the future event we are awaiting to ripen (or solve) this dispute—final action on the 2011 proposed rule—is not within the discretion of or controlled by the agency as would usually be the case. EPA did not issue a notice of proposed rulemaking on its own volition or set its own deadline for final action. Rather, EPA agreed to issue the 2011 proposed rule as part of its settlement with the Sierra Club, which had sought repeal of the 2008 Rule based on allegations that it was not sufficiently protective of human health and the environment. That settlement requires EPA to take final action concerning the proposed rulemaking by December 31, 2012. This definite end date to the delay we would effectively impose by deeming this case unripe further alleviates any concern that EPA is using a new rulemaking to elude review.

*6 Also, when we consider the fitness of an issue for review, we ask whether it is "purely legal." *Atl. States Legal Found.,* 325 F.3d at 284. This issue does involve the interpretation of a statute; that statute is entrusted for its administration to EPA. Under *Chevron, U.S.A., Inc. v. NRDC, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we will afford the agency's interpretation significant deference. It is more consistent with the conservation of judicial resources to make that deference-bound review after the agency has finalized its application of the relevant statutory text.

Lastly, to protect against the unlikely and the unpredictable, we can hold the case in abeyance pending resolution of the proposed rulemaking, subject to regular reports from EPA on its status. *See, e.g., Devia,* 492 F.3d at 426; *Stratford v. FAA,* 285 F.3d 84 (D.C.Cir.2002), *reh'g denied,* 292 F.3d 251 (D.C.Cir.2002); *Blumenthal v. FERC,* 2003 WL 21803316 (D.C.Cir.2003). If the rulemaking takes an unforeseen turn, we can reassess whether the dispute has ripened at that time.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2012 WL 2053572 (C.A.D.C.)
**(Cite as: 2012 WL 2053572 (C.A.D.C.))**

**B.**

To outweigh these "institutional interests in the deferral of review," any hardship caused by that deferral must be "immediate and significant." *Devia, 492 F.3d at 427* (internal quotation marks omitted). Considerations of hardship that might result from delaying review "will rarely overcome the finality and fitness problems inherent in attempts to review tentative positions." *Pub. Citizen Health Research, 740 F.2d at 31*. So here.

API asserts that deferring review of the 2008 Rule would cause hardship by increasing the time during which its members are precluded from taking advantage of cost savings that would come from deregulation of the spent refinery catalysts they generate and send for reclamation. API suggests that if the catalysts were no longer considered hazardous waste, transporting the catalysts to reclaimers would be less expensive and market prices for recycling them would decrease because facilities without hazardous-waste permits could enter the market.

But even assuming API's members would eventually realize cost savings from deregulation of the catalysts, it is not at all clear that they could take advantage now if we decided this petition in their favor. New federal requirements under RCRA do not take effect in any State that manages its own RCRA program until that State adopts those requirements. States are only required to adopt new federal requirements that are more stringent than existing requirements. If EPA takes action that is deregulatory in nature, States may, but are not required to, adopt the resulting less stringent rule. Because the 2008 Rule's transfer-based exclusion is deregulatory, it only goes into effect in those States that choose to adopt it. So far, only four States have done so, and the exclusion is effective in two other States where EPA administers the hazardous waste program. Refinery catalysts are apparently generated in only three of these States, and even as to those States, API has not shown that any of the three States have reclamation facilities where the spent refinery catalysts could be sent at a lower cost for its members. While we do not discount the possibility of some financial hardship, API has not shown such a burden as to warrant a potentially improvident decision of an otherwise unripe issue by this court.

**III.**

**\*7** For the above reasons, we hold that API's petition is not ripe for review. We will hold this case in abeyance subject to status reports in accordance with the terms of the order accompanying this opinion.

C.A.D.C.,2012.
American Petroleum Institute v. E.P.A.
--- F.3d ----, 2012 WL 2053572 (C.A.D.C.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.