**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**BELMONT ABBEY COLLEGE,**

    **Plaintiff,**

      **v.**

**KATHLEEN SEBELIUS, Secretary of the U.S. Department of Health and Human Services,** *et al.*,

    **Defendants.**

Civil Action No. 11-1989 (JEB)

---

## MEMORANDUM OPINION

Under the Patient Protection and Affordable Care Act of 2010, employers are required to offer group health-insurance plans that cover certain forms of preventive care without charging a co-payment. For example, the Act mandates that group health plans pay in full for all FDA-approved contraceptive services sought by plan participants, including sterilization procedures, emergency oral contraception (such as the "morning-after" pill), and counseling for women of reproductive age. The Departments of Health and Human Services, Treasury, and Labor subsequently issued regulations to that effect, while simultaneously carving out a narrow exemption to the contraceptive-coverage requirement for religious organizations that meet specific criteria.

Plaintiff Belmont Abbey is a Benedictine college in North Carolina that shares the Catholic Church's view that contraception, sterilization, and abortion are "grave sins." See Am. Compl., ¶¶ 24-25. Belmont alleges that it would violate its strongly held religious beliefs to sponsor any health-insurance plan that pays for these services. Believing it is ineligible for an

exemption, Belmont contends that it is required by law to comply with the contraceptive-coverage mandate.

On November 10, 2011, the Abbey filed the instant suit alleging that this mandate violates the First Amendment, the Administrative Procedure Act, and the Religious Freedom Restoration Act.  Instead of addressing the merits of such claims, Defendants have now moved to dismiss the action for lack of subject-matter jurisdiction.  Because the government has indicated its intention to amend the regulations to better take into account religious objections and because Plaintiff is protected in the interim by a safe-harbor provision, the Court agrees that Belmont's injury is too speculative to confer standing and that the case is also not ripe for decision.  Dismissal without prejudice is thus appropriate.

## I.      Background

A.  <u>Statutory and Regulatory Background</u>

The Patient Protection and Affordable Care Act (ACA), Pub. L. No. 111-148, 124 Stat. 119, enacted in March 2010, requires group health plans to provide women with "preventive care and screenings" at no charge to the patient.  <u>See</u> 42 U.S.C. § 300gg-13(a)(4); <u>see also</u> 155 Cong. Rec. S12019, S12025, S12261, S12271.  Specifically, the ACA mandates that non-grandfathered group health plans and health-insurance issuers cover without "impos[ing] any cost sharing requirements … such additional preventive care and screenings [for women] … as provided for in comprehensive guidelines supported by the Health Resources and Services Administration [HRSA] for purposes of this paragraph."  42 U.S.C. § 300gg-13(a)(4).

The Department of Health and Human Services commissioned the Institute of Medicine (IOM), a private health-policy organization, to develop recommendations for the HRSA guidelines.    <u>See</u>    <u>http://www.iom.edu/Reports/2011/Clinical-Preventive-Services-for-Women-</u>

Closing-the-Gaps.aspx.  After consulting with a committee of experts, IOM published a report suggesting specific preventive health measures to be included in the guidelines.  Id.  Among other things, IOM proposed that insurance plans be required to cover "[t]he full range of Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity."  Id. at 3; Clinical Preventive Services for Women: Closing the Gaps at 10, 165.  This would include emergency contraceptives such as Plan B and ulipristal, commonly known as the morning-after pill and the week-after pill, respectively.  See www.fda.gov/forconsumers/byaudience/forwomen/ucm118465.htm.

HRSA adopted IOM's recommendations in full, see http://www.hrsa.gov/womensguidelines, and on August 1, 2011, HHS, the Department of Labor, and the Department of Treasury promulgated an interim final rule requiring "group health plan[s] and … health insurance issuer[s] offering group or individual insurance coverage [to] provide benefits for and prohibit the imposition of cost-sharing with respect to" the preventive services for women included in HRSA's guidelines.  See 76 Fed. Reg. 46621; 45 C.F.R. § 147.130;  see also http://www.iom.edu/Reports/2011/Clinical-Preventive-Services-for-Women-Closing-the-Gaps/Action-Taken.aspx.  Thus, according to the regulation, all plans and policies, unless grandfathered or otherwise exempt, must cover contraceptive services for plan years beginning on or after August 1, 2012.  See 76 Fed. Reg. 46621-01.

To account for organizations that might have religious objections to contraception, the interim final rule authorized HRSA to release certain employers from the requirements concerning coverage for contraceptives.  See 76 Fed. Reg. 46621-01, 46623 (issued on August 1, 2011, and published August 3, 2011); 45 C.F.R. §§ 147.130(a)(1)(iv)(A)-(B).  Only employers that meet all of the following criteria would be eligible for an exemption:

(1) The inculcation of religious values is the purpose of the organization.

(2) The organization primarily employs persons who share the religious tenets of the organization.

(3) The organization serves primarily persons who share the religious tenets of the organization.

(4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended.

45 C.F.R. §§ 147.130(a)(1)(iv)(B)(1)-(4) (HHS); see also 26 C.F.R. § 54.9815-2713T (Treasury); 29 CFR § 2590.715-2713 (Labor).   The IRS code sections in the regulation, furthermore, refer to "churches, their integrated auxiliaries, and conventions or associations of churches" and "the exclusively religious activities of any religious order."  See Internal Revenue Code 6033(a)(3)(A)(i), (iii).  The HRSA used the discretion conferred by the regulation to exempt group health plans sponsored by organizations that satisfy these criteria from the contraceptive-services coverage requirement.  See 77 Fed. Reg. 8725-01.  The parties agree that Belmont is not exempted under this provision because it employs and serves many individuals who do not share its religious values and because it is not a church and does not otherwise qualify as an organization described in the relevant sections of the IRS Code.

Upon issuing the interim final rule, the Departments requested comments, specifically regarding the definition of religious employer in the regulation.  Id. at 8726.  Over 200,000 comments were submitted from groups and individuals ranging from religiously affiliated institutions to women's rights organizations to concerned citizens.  Id.  Some commenters urged the Departments to expand the definition of religious employer to include religiously affiliated educational institutions, health care organizations, and charities, while others recommended that the exemption be removed from the regulation altogether.  Id.  at 8726-27.

4

After considering these alternatives and others, the Departments decided to leave the exemption unchanged, while also creating a one-year enforcement "safe harbor" for "certain non-exempted, non-profit organizations with religious objections to covering contraceptive services." Id. at 8728.  In guidance issued by HHS on February 10, 2012, the Department stated that, during the safe-harbor period, employers, group health plans, and group health-insurance issuers would not "be subject to any enforcement action by the Departments for failing to cover recommended contraceptive services without cost sharing in non-exempted, non-grandfathered group health plans."  See Guidance on the Temporary Enforcement Safe Harbor for Certain Employers, Group Health Plans and Group Health Insurance Issuers with Respect to the Requirement to Cover Contraceptive Services Without Cost Sharing Under Section 2713 of the Public Health Service Act, Section 715(a)(1) of the Employee Retirement Income Security Act, and Section 9815(a)(1) of the Internal Revenue Code at 3, available at http://cciio.cms.gov/resources/files/Files2/02102012/20120210-Preventive-Services-Bulletin.pdf (last visited July 10, 2012) ["Guidance"].  The safe harbor will remain in effect "until the first plan year that begins on or after August 1, 2013," and Treasury and Labor have agreed to abide by it as well.  Id. at 2-3.

When HHS, Labor, and Treasury issued their final rule in February of 2012, they announced their intention to develop alternative means of providing contraceptive services free of charge to employees of non-exempt, non-grandfathered organizations with religious objections to contraceptive coverage.  See 77 Fed. Reg. 8728 (published Feb. 15, 2012). Specifically, the final regulation stated that the Departments "plan to initiate a rulemaking to require issuers to offer insurance without contraception coverage to such an employer (or plan sponsor) and simultaneously to offer contraceptive coverage directly to the employer's plan

participants (and their beneficiaries) who desire it, with no cost-sharing." Id.  The Departments indicated that they would work with stakeholders to propose and finalize this policy before the expiration of the enforcement safe harbor.  Id. at 8728-29.

Indeed, on March 21, 2012, the Departments issued an Advance Notice of Proposed Rulemaking (ANPRM) formally declaring their intention to amend the final regulations and soliciting input from interested parties and the public.  The ANPRM presents questions and ideas about how to "accommodat[e] non-exempt, non-profit religious organizations' religious objections to covering contraceptive services," while "assuring that participants and beneficiaries covered under such organizations' plans receive contraceptive coverage without cost sharing." 77 Fed. Reg. 16503.  After the 90-day comment period on the ANPRM, the Departments will publish a Notice of Proposed Rulemaking, which will afford the public another opportunity for comment before amended final regulations are issued.  Id.

B.  Belmont Abbey College

According to its Amended Complaint, Belmont Abbey College is a private Catholic college founded by Benedictine monks in North Carolina in 1876.  See Am. Compl., ¶ 12.  The teachings of the Catholic Church remain central to its purpose.  Id., ¶ 23.  The College's mission statement is inspired by St. Benedict's desire "'that in all things God may be glorified,'" and Benedictine monks not only serve on the College's Board of Trustees but also provide the institution with significant financial support.  Id., ¶¶ 21-22.  In addition, Belmont adheres to the law of the Roman Catholic Church for Catholic colleges and universities.  Id., ¶ 22.

The College shares the Catholic Church's view that all human life, having been created in the image and likeness of God, is sacred from the time of conception.  Id., ¶ 24.  In accordance with this view, the College "teaches that abortion ends a human life and is a grave sin."  Id.  It likewise believes that one of the central purposes of human sexuality is "the generation of new

lives." Id., ¶ 25.  Based on this premise, it concludes that "'any action which either before, at the moment of, or after sexual intercourse, is specifically intended to prevent procreation, whether as an end or means' – including contraception and sterilization – is a grave sin."   Id.  Plaintiff claims that it would therefore violate Belmont's religious beliefs to provide health insurance that would cover or facilitate access to "contraception, sterilization, abortion or related education and counseling…." Id., ¶¶ 28-30.

    C. Procedural History

On November 10, 2011, Belmont filed suit against the United States and the three Departments responsible for the contraceptive-services regulation – *i.e.*, HHS, Labor, and Treasury (and their Secretaries).  The suit challenges the ACA and the administrative regulations requiring insurance coverage for contraceptives as violative of the First Amendment, the Administrative Procedure Act, and the Religious Freedom Restoration Act.   Id., ¶¶ 105-92. After the Complaint had been filed, Defendants finalized the interim rule, issued guidance on a temporary-enforcement safe harbor, and announced their plans to amend the regulation to accommodate religious organizations' objections to providing insurance coverage for contraceptives. See Def. Mot. to Dismiss (ECF No. 15) at 6-7.  Defendants subsequently moved to dismiss for lack of jurisdiction, contending that Plaintiff lacked standing and that the case was not ripe for judicial review. Id. at 11-20.  Plaintiff opposed and separately sought leave to file an Amended Complaint in light of the developments that had occurred since it brought suit.  ECF Nos. 20-21.  The Court permitted Plaintiff to file an Amended Complaint and, accordingly, denied Defendants' Motion to Dismiss without prejudice as moot. See Minute Order of March 20, 2012.

On April 5, 2012, Defendants renewed their Motion, again seeking dismissal on standing and ripeness grounds.  The Court turns to that Motion now.

## II.      Legal Standard

In evaluating a motion to dismiss for lack of standing or ripeness under Rule 12(b)(1), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal citation omitted); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).  The Court need not accept as true, however, "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the Complaint.  Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)) (internal quotation marks omitted).

To survive a motion to dismiss under Rule 12(b)(1), Plaintiff bears the burden of proving that the Court has subject-matter jurisdiction to hear its claims.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).  A court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority."  Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  "For this reason, 'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim."  Id. at 13-14 (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987) (alteration in original)).

Additionally, unlike with a motion to dismiss under Rule 12(b)(6), the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction …."  Jerome Stevens, 402 F.3d at 1253; see also Venetian Casino Resort, L.L.C. v. E.E.O.C., 409 F.3d 359, 366 (D.C. Cir. 2005) ("given the present posture of this case — a

dismissal under Rule 12(b)(1) on ripeness grounds — the court may consider materials outside the pleadings"); Herbert v. Nat'l Academy of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992).

## III.   Analysis

Defendants contend that this Court does not have jurisdiction to decide Plaintiff's claims because (1) Plaintiff has not alleged an "imminent injury" and therefore lacks standing, and (2) the regulation Belmont seeks to invalidate may well be amended to address the concerns of Plaintiff and similarly situated organizations before it is enforced, thereby absolving the need for judicial intervention and rendering the matter unripe.  The Court will evaluate these arguments in turn.

### A.  Standing

Defendants first seek to dismiss Plaintiff's Amended Complaint on the ground that Belmont lacks standing, thereby depriving the Court of subject-matter jurisdiction.  Article III of the Constitution limits the power of the federal judiciary to the resolution of "Cases" and "Controversies."   U.S. Const. art. III, § 2; see also Allen v. Wright, 468 U.S. 737, 750 (1984) (discussing case-or-controversy requirement).   "This limitation is no mere formality: it 'defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded.'"  Dominguez v. UAL Corp., 666 F.3d 1359, 1361 (D.C. Cir. 2012) (quoting Allen, 468 U.S. at 750).  Because "standing is an essential and unchanging part of the case-or-controversy requirement of Article III," Lujan, 504 U.S. at 560, finding that a plaintiff has standing is a necessary "predicate to any exercise of [the Court's] jurisdiction."   Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996).

The doctrine of standing "requires federal courts to satisfy themselves that 'the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant [its] invocation

of federal-court jurisdiction." Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009) (emphasis in original) (citing Warth v. Seldin, 422 U.S. 490, 498-99 (1975)). At its "irreducible constitutional minimum," the doctrine requires a plaintiff to prove three elements: (1) a concrete and imminent injury-in-fact, (2) a causal relationship between the injury and defendants' challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable decision. See Lujan, 504 U.S. at 560-61. Organizations suing on their own behalf, like individuals, must also satisfy these three requirements. See Nat'l Taxpayers Union, Inc. v. United States, 68 F.3d 1428, 1433 (D.C. Cir. 1995) (citing Havens Realty Corp. v. Coleman, 455 U.S. 363, 378 (1982)).

Here, Defendants contend that Plaintiff fails the first prong – namely, it has not alleged an injury sufficient to support standing. See Mot. at 12. To satisfy the "injury-in-fact" requirement, a plaintiff must establish that it has suffered (or will suffer) "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (internal quotations omitted). Put another way, a threatened injury must be "certainly impending" to confer standing; harm that is possible or even likely will not suffice. Whitmore v. Arkansas, 495 U.S. 149, 158 (1990).

Defendants maintain that Plaintiff has failed to meet this standard for three reasons. First, the preventive-services regulation does not apply to plans that are "grandfathered," and, according to Defendants' Motion, Plaintiff has not sufficiently alleged that it is ineligible for grandfather status. See Mot. at 13-14. Second, even if Plaintiff's plan is not grandfathered, Defendants argue that the safe-harbor provision renders the threatened harm from the contraceptive-coverage regulation too remote to constitute "imminent" injury. See Mot. at 15. Finally, Defendants contend that any injury from enforcement of the provision after the safe

harbor expires is purely speculative, as they have declared their intention to amend the rule before that time in order to accommodate religious organizations' concerns about funding or facilitating access to contraception through their health-insurance plans. Id. at 16-17.

### 1. *Grandfather Status*

The contraceptive-coverage provision does not apply to health plans that are grandfathered. See 26 C.F.R. § 54.9815-1251T(c)(1); 42 U.S.C. § 18011; see also Guidance at 1. A health insurance plan is "grandfathered" if at least one person was enrolled on March 23, 2010, and the plan has continuously covered at least one individual since that date. See 42 U.S.C. § 18011(a)(2); 26 C.F.R. §§ 54.9815-1251T(a), (g); 45 C.F.R. §§ 147.140(a), (g); 29 C.F.R. §§ 2590.715-1251(a), (g). To remain grandfathered, the plan must also provide annual notice of such status. Id.

Plaintiff disputes Defendants' initial contention that it has not adequately pled its ineligibility for grandfather status. In asserting that the plan was not grandfathered, Am. Compl., ¶¶ 94-95, the Amended Complaint alleges that Belmont Abbey offered a "new ... plan" beginning in 2011. Id., ¶ 34. While Defendants correctly point out that a plan "does not cease to be grandfathered ... merely because the plan (or its sponsor) enters into a new policy, certificate, or contract of insurance after March 23, 2010," 45 C.F.R. § 147.140(a)(1)(i), that is not what Plaintiff alleges here. Rather, the Complaint states that Belmont Abbey adopted a new plan – that is, a plan that "did not exist – and therefore did not cover anyone – on March 23, 2010." Opp. at 11 (emphasis in original). Assuming that to be true, as the Court must when deciding a Motion to Dismiss, the plan could not be grandfathered. See Jenkins v. McKeithen, 395 U.S. 411, 421-22 (1969) (when ruling on motion to dismiss for lack of standing, court must accept material allegations in Complaint as true and construe them in opposing party's favor).

While Defendants maintain that the mere allegation that Plaintiff "adopted a new <u>plan</u>" does not sufficiently plead ineligibility for grandfather status, they concede in their Reply that the materials Plaintiff submitted with its Opposition "plausibly suggest that [P]laintiff's plan has not satisfied the disclosure requirements for maintaining grandfather status." <u>See</u> Reply at 2 n.1 (emphasis in original). They have, accordingly, decided not to press the argument that Plaintiff's plan may be grandfathered at this stage. <u>Id.</u>

In light of the foregoing, the Court concludes that Plaintiff has sufficiently alleged that its plan is ineligible for grandfather status. Since Plaintiff does not qualify for the religious-employer exemption either, <u>see</u> 45 C.F.R. §§ 147.130(a)(1)(iv)(B)(1)-(4), it is bound by the interim final rule requiring group health plans to fully cover the cost of contraception unless some other exemption applies.

2. *Enforcement Safe Harbor*

Defendants contend that, even if its plan is not grandfathered, Belmont Abbey is protected by the safe-harbor provision; as it would not be subject to enforcement before January 1, 2014, any threatened injury is "too remote temporally" to be considered "imminent." Mot. at 15. Belmont has two responses to this line of argument. First, it suggests that it may in fact be ineligible for the safe harbor. Opp. at 13. To receive the temporary exemption from enforcement, an organization must certify that "contraceptive coverage has not been provided by the plan" on or after February 10, 2012. HHS Bulletin at 3, 6. Because Plaintiff does not object to covering prescriptions ordinarily used for contraception when they are employed for other purposes, it contends that it may not be able to make the requisite certification. Opp. at 13. The regulations make clear, however, that this would not disqualify an organization from the protections of the safe harbor. <u>See</u> 77 Fed. Reg. 16501, 16504 (indicating that organizations that

12

cover <u>some</u> contraceptives may qualify for the safe harbor).  The Court, consequently, finds no basis to conclude that Plaintiff would be ineligible for the benefits of the safe harbor.

Second, even if Plaintiff is protected by the safe harbor, it argues that the injury is sufficiently imminent to satisfy the standing requirements.  In its view, the safe harbor merely delays enforcement by one year; it does not (in and of itself) reduce the certainty of the impending injury.  <u>See</u> HHS Bulletin at 2-3; <u>see also</u> <u>Regional Rail Reorg. Act Cases</u>, 419 U.S. 102, 143 (1974) (when "the inevitability of the operation of a statute against certain individuals is patent," "it is irrelevant … that there will be a time delay before the disputed provisions will come into effect").  Under the interim final rule, Plaintiff would be subject to enforcement beginning in January 2014.  <u>See</u> HHS Bulletin at 3; Am. Compl., ¶¶ 33, 119 (stating that Plaintiff's plan year begins on January 1); <u>see also</u> Mot. at 15.  That looming deadline, it contends, is not too remote.  <u>See</u> Opp. at 13-15.

The Court agrees.  In another ACA case presenting a nearly identical question of whether the plaintiffs' alleged injuries were "imminent" for standing purposes, the Eleventh Circuit held that an injury that would not occur for over two years was sufficient for standing.  <u>See</u> <u>Florida ex rel. Atty. Gen., et al. v. U.S. Dept. of Health and Human Services</u>, 648 F.3d 1235, 1243 (11th Cir. 2011) (holding that at least one plaintiff had standing to challenge provisions of ACA that would not take effect until January 1, 2014), <u>reversed in part on other grounds by</u> <u>Nat'l Fed'n of Indep. Bus. et al. v. Sebelius</u>, 132 S. Ct. 2566 (June 28, 2012).  In fact, the defendants there – which are the same parties being sued here – conceded on appeal that the individual plaintiffs had standing to contest the constitutionality of the ACA's individual mandate.  <u>Florida ex rel. Atty. Gen.</u>, 648 F.3d at 1243. ("Notably, the government does not contest the standing of the individual plaintiffs or of the NFIB to challenge the individual mandate.").  Since standing is a

jurisdictional requirement that cannot be waived by the parties, see United States v. Hays, 515 U.S. 737, 742 (1995), this concession could not properly have been the basis for the Court's finding that the claims were justiciable.   Rather, the court independently concluded that the allegations of injury satisfied the injury-in-fact requirement even though the challenged provisions would not take effect until 2014.  See Florida ex rel. Atty. Gen., 648 F.3d at 1243.

The time until the rule may be enforced in this case, furthermore, is short in comparison with other cases in which courts have found standing.  The Supreme Court has allowed plaintiffs to proceed when challenging laws that would not take effect for three and even six years (or thereabouts).  See New York v. United States, 505 U.S. 144, 153-54 (1992); Pierce v. Soc'y of Sisters, 268 U.S. 510, 530, 536 (1925).   Thus, postponing enforcement of the challenged regulation against Plaintiff until January 2014 does not defeat standing here.  See Seven-Sky v. Holder, 661 F.3d 1, 4 (D.C. Cir. 2011) (addressing validity of ACA provision that becomes effective in January 2014), abrogated by Nat'l Fed'n of Indep. Bus., 132 S. Ct. 2566.

 Because the Court holds that the temporary-enforcement safe harbor does not render the alleged injury too remote to constitute an injury, it need not reach Plaintiff's alternative argument that the safe harbor cannot destroy standing because it is not binding and could be abandoned at any point.  See Opp. at 15-16.

### 3.  *Advance Notice of Proposed Rulemaking*

While the imminent end of the safe harbor provides Plaintiff with an injury, this does not terminate the analysis.  Defendants argue that the alleged injury is nonetheless too speculative to confer standing given the government's clear intention to amend the regulations before the safe harbor lapses in order to accommodate organizations with religious objections to contraception. They are correct.  The "underlying purpose of the imminence requirement is to ensure that the

court in which suit is brought does not render an advisory opinion in 'a case in which no injury would have occurred at all.'"  Animal Legal Def. Fund, Inc. v. Espy, 23 F.3d 496, 500 (D.C. Cir. 1994) (quoting Lujan, 504 U.S. at 564 n.2).  This is precisely the type of case where concerns about premature judicial intervention come into play.

Plaintiff argues that non-binding promises of future rulemaking cannot defeat standing. Contrary to Plaintiff's assertions, however, Defendants have done more than simply "open another docket to propose addressing related matters."  Opp. at 18 (citing Am. Bird Conservancy, Inc. v. FCC, 516 F.3d 1027, 1031 n.1 (D.C. Cir. 2008) ("[A]gencies cannot avoid judicial review of their final actions merely because they have opened another docket that may address some related matters.")).  They have published their plan to amend the rule to address the exact concerns Plaintiff raises in this action and have stated clearly and repeatedly in the Federal Register that they intend to finalize the changes before the enforcement safe harbor ends.  See 77 Fed. Reg.  8725, 8728, 16502-03.  Not only that, but Defendants have already initiated the amendment process by issuing an ANPRM.  See 77 Fed. Reg. 16503.  The government, moreover, has done nothing to suggest that it might abandon its efforts to modify the rule – indeed, it has steadily pursued that course – and it is entitled to a presumption that it acts in good faith.  See Sossamon v. Lone Star State of Texas, 560 F.3d 316, 325 (5th Cir. 2009) ("Without evidence to the contrary, we assume that formally announced changes to official governmental policy are not mere litigation posturing."); see also Comcast Corp. v. F.C.C., 526 F.3d 763, 769 n.2 (D.C. Cir. 2008) ("We must presume an agency acts in good faith….") (citing Thomas v. Baker, 925 F.2d 1523, 1525 (D.C. Cir. 1991)); Adair v. England, 183 F. Supp. 2d 31, 60 (D.D.C. 2002) ("government officials are presumed to act in good faith .... [P]laintiff must present 'well-

nigh irrefragable proof" of bad faith or bias on the part of governmental officials in order to overcome this presumption") (internal quotations and citation omitted).

Because an amendment to the final rule that may vitiate the threatened injury is not only promised but underway, the injuries alleged by Plaintiff are not "certainly impending."   See Whitmore v. Arkansas, 495 U.S. at 158.  Plaintiff consequently lacks standing to bring its claims at this juncture, and the Court must thus dismiss the case for lack of subject-matter jurisdiction.

B.  Ripeness

Defendants likewise contend that the claims in the Amended Complaint are not ripe for adjudication.  Although the Court need not address this argument – having already decided that Plaintiff has not satisfied the standing requirements – it is nevertheless worthwhile to do so as ripeness implicates many of the same concerns underlying the Court's standing analysis.  See Am. Petroleum Inst. v. Envtl. Prot. Agency, --- F.3d ----, 2012 WL 2053572, at *3 (D.C. Cir., June 8, 2012) (noting that part of ripeness doctrine is "subsumed into the Article III requirement of standing");  Wyo. Outdoor Council v. U.S. Forest Serv., 165 F.3d 43, 48 (D.C. Cir. 1999) (ripeness doctrine not always clearly separable from standing).   Indeed, many of Plaintiff's arguments with respect to standing rely on cases addressing ripeness.  See, e.g., Opp. at 17 (citing Am. Petroleum Inst. v. EPA, 906 F.2d 729, 739-40 (D.C. Cir. 1990), in its standing argument for proposition that possibility of unforeseen amendments does not render a challenge unripe), id. at 15 (arguing for standing based on case that found claim ripe under allegedly similar circumstances).

At its foundation, ripeness is about whether a federal court "can or should decide a case." Am. Petroleum Inst., 2012 WL 2053572, at *3.  The doctrine's purpose is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial

interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49 (1967). The requirement that a claim be ripe derives both from Article III limits on justiciability and from prudential considerations that counsel against exercising jurisdiction. See Reno v. Catholic Social Services, Inc., 509 U.S. 43, 57 n.18 (1993); see also Full Value Advisors, LLC v. S.E.C., 633 F.3d 1101, 1106   (D.C. Cir. 2011) ("Because of the prudential considerations which innervate the ripeness doctrine, at times, we 'dismiss[ ] even if there is not a constitutional bar to the exercise of our jurisdiction.'") (quoting Wyo. Outdoor Council, 165 F.3d at 48).  It "ensures that Article III courts make decisions only when they have to, and then, only once."   Am. Petroleum Inst., 2012 WL 2053572, at *4 (citing Devia v. NRC, 492 F.3d 421, 424 (D.C. Cir. 2007); Pub. Citizen Health Research Grp. v. FDA, 740 F.2d 21, 30–31 (D.C. Cir. 1984)).

To assess whether a claim is ripe, courts consider two factors: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Abbott Laboratories, 387 U.S. at 149; see also Pfizer Inc. v. Shalala, 182 F.3d 975, 978 (D.C. Cir. 1999). These twin prongs seek to "'balance [the court's] interest in deciding the issue in a more concrete setting against the hardship to the parties caused by delaying review.'" Atlantic Richfield Co. v. United States Dep't of Energy, 769 F.2d 771, 783 (D.C. Cir. 1984) (citation omitted).  If a court determines that a claim is fit for judicial resolution, the "[lack of] hardship cannot tip the balance against judicial review." Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs, 440 F.3d 459, 465 (D.C. Cir. 2005) (citation omitted).  A showing of "hardship to the parties" can, however, "outweigh[] the competing institutional interests in deferring review." Eagle-Picher Indus. v. EPA, 759 F.2d 905, 915 (D.C. Cir. 1985).

     1.   *Fitness*

In a review of agency action, the requirement that a claim be fit for judicial resolution "is primarily meant to protect 'the agency's interest in crystallizing its policy before that policy is subjected to judicial review and the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting.'" Am. Petroleum Inst., 2012 WL 2053572, at *4 (quoting Wyo. Outdoor Council, 165 F.3d at 49 (internal quotation marks omitted)).  A claim satisfies the fitness requirement only if it is "essentially legal" and "sufficiently final." International Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock, 783 F.2d 237, 249 (D.C. Cir. 1986).

The Court will consider the finality prong first, as it is at the heart of the parties' dispute. In evaluating that criterion, the Court must decide whether the regulations requiring non-exempt, non-grandfathered plans to cover the full range of contraceptive services in the HRSA guidelines are final enough for the Court to address the merits of Plaintiff's challenge.  While the Court is mindful that the Supreme Court has instructed lower courts to apply the finality requirement in a "flexible" and "pragmatic" manner, see Abbott Laboratories, 387 U.S. at 149-50, it nevertheless recognizes that courts should "decline to review 'tentative' agency positions."   Am. Petroleum Inst., 2012 WL 2053572, at *4.  To do so would "'severely compromise[] the interests' the ripeness doctrine protects," including the interests in affording an agency the "'opportunity to apply its expertise and to correct errors'" and in conserving judicial resources. Id. (quoting Pub. Citizen Health Research, 740 F.2d at 31).

The Court's task, therefore, is to determine whether the ANPRM in conjunction with Defendants' promises to issue amended regulations render the "final" rules tentative for purposes of the ripeness inquiry.  The D.C. Circuit recently had occasion to assess ripeness under a similar set of facts.  In American Petroleum Institute, Plaintiff, a trade association, sought judicial

review of a "final rule" issued by the EPA in 2008 deregulating "hazardous secondary materials." See 2012 WL 2053572, at *1-2.   In issuing that rule, the EPA explicitly declined to deregulate a category of materials called spent refinery catalysts, electing instead to "address the catalysts in a separate proposed rulemaking." Id. at *2.  The American Petroleum Institute filed a suit challenging that decision, and in July 2011, shortly after the parties had fully briefed the merits of the case, the EPA published a notice of proposed rulemaking that would revise the 2008 rule and deregulate the catalysts.  If the proposed rule were finalized without revision, the case would "go[] away without the need for judicial review." Id. at *4.

The D.C. Circuit concluded that the case was not ripe because, although the 2008 regulation was a "final rule," the EPA's position on the policy being challenged was tentative. See id.  Central to the Court's analysis was the fact that the proposed rulemaking might obviate the need for judicial review.  See id. ("In light of the July 2011 proposed rule, though, '[i]f we do not decide [the issue] now, we may never need to.'") (quoting Nat'l Treasury Emps. Union v. U.S., 101 F.3d 1423, 1431 (D.C. Cir. 1996)); see also Devia v. NRC, 492 F.3d 421, 424 (D.C. Cir. 2007) ("when an agency decision may never have its effects felt in a concrete way by the challenging parties, the prospect of entangling ourselves in a challenge to such a decision is an element of the fitness determination as well") (internal citation and quotation marks omitted). The Court also emphasized that the rulemaking process would provide the plaintiff with "a chance to convince the EPA to change its mind." Id.  Given that the Court could not know what shape the final rule would take, it determined that it would be best to withhold review until the matter was settled.  Id.  If the new rulemaking did not ultimately resolve the plaintiff's claims, the Court reasoned that it would at least "narrow the legal issues involved … and provide a more final and concrete setting for deciding any issues left on the table." Id.

The same rationale applies in this case. Just as in <u>American Petroleum Institute</u>, the Court has before it a challenge to final regulations that Defendants have promised to amend. Defendants have taken the first step toward amending the rules by issuing an ANPRM. While the <u>Advance</u> Notice of Proposed Rulemaking is a more preliminary step than the Notice of Proposed Rulemaking that was issued in <u>American Petroleum Institute</u>, they serve the same purpose in this ripeness inquiry: both announce the agency's intention to modify an existing regulation and invite public comments that will ultimately inform the drafting of the final amendment. <u>See</u> 77 Fed. Reg. 16503; <u>Am. Petroleum Inst.</u>, 2012 WL 2053572, at *2-3. The Advance Notice simply allows the agency to receive comments from interested parties before publishing a proposed rule. <u>See</u> 77 Fed. Reg. 16507-08 (stating that the ANPRM's comment period is designed to "inform the notice of proposed rulemaking" and that "[t]he subsequent notice of proposed rulemaking will also include a public comment period"). The Court thus concludes – for the same reasons offered in <u>American Petroleum</u> – that the Departments' position on the policy at issue remains indeterminate. Because "the interest in postponing review is powerful when the agency position is tentative," <u>Ciba-Geigy Corp v. EPA</u>, 801 F.2d 430, 436 (D.C. Cir. 1986), the Court holds that the challenged rule is not "sufficiently final" to satisfy the fitness prong of the ripeness inquiry. <u>See also Full Value Advisors</u>, 633 F.3d at 1107 ("A claim is not ripe where the 'possibility that further consideration will actually occur before [implementation] is not theoretical, but real.'") (quoting <u>Ohio Forestry Ass'n, Inc. v. Sierra Club</u>, 523 U.S. 726, 735 (1998)).

Plaintiff maintains that its claims are ripe for judicial review because, even if the proposed amendment is finalized, Plaintiff will not be able to comply without violating its religious beliefs about contraception. <u>See</u> Opp. at 18. This argument assumes, however, that a

particular approach described in the ANPRM – which would require health-insurance issuers to offer group plans without contraceptive coverage to organizations with religious objections while "simultaneously [providing] contraceptive coverage directly to the participants and beneficiaries covered under the organization's plan with no cost sharing," see 77 Fed. Reg. 16503 – will make it into the final rule.   Such an assumption is speculative.   The ANPRM merely "presents questions and ideas to help shape discussions" regarding how best to accommodate organizations with religious objections to contraceptive coverage.   Id.   The Notice specifically states that it seeks input on the options it proposes "as well as new ideas to inform the next stage of the rulemaking process."   Id. (emphasis added).   The rulemaking process is still in its early stages, and the contents of the final amendment have not yet been decided.   It would thus be premature to find that the amendment will not adequately address Plaintiff's concerns.

Plaintiff argues, in addition, that if the Court allows a Notice of Proposed Rulemaking to render an action for administrative review non-justiciable, agencies could avoid judicial review simply by issuing NPRs whenever a legal challenge is brought against the agency.   Opp. at 17-18.   The D.C. Circuit also addressed that concern in American Petroleum.   See 2012 WL 2053572, at *5.   While acknowledging the potential for agencies to abuse the notice process, the court found that that risk was not present in that case because the EPA's proposed rule was "clearly not some non-substantive, thinly veiled attempt to evade review."   Id.   The Court also emphasized that the proposed rulemaking in that case had a "definite end date" (imposed by conditions of a related settlement agreement), thereby preventing the agency from averting judicial scrutiny indefinitely.

While the circumstances are slightly less favorable to the agency here, they nevertheless counsel the same result.   The ideas and questions raised in the ANPRM appear to be the product

of significant research and deliberation, see 77 Fed. Reg. 16501-01 (citing findings of actuaries and experts and referencing consultations with interested parties), and although there is not an externally imposed deadline on the rulemaking as there was in American Petroleum, the expiration of the enforcement safe harbor operates in a similar manner.  Even though the safe harbor's end date was set by the agency, the agency has published it in the Federal Register and has formally committed to amending the rule before the safe harbor expires, thereby creating external accountability for the agency's self-imposed deadline.  See 77 Fed. Reg. 8728-29, 16503.  If the agency fails to amend the exemption from the contraceptive-coverage provision by the time the safe harbor lapses, Plaintiff will be free to renew its challenge to the rule at that time.  The Court, therefore, finds that the agency's position is not sufficiently final to render the regulation "fit" for judicial review.

Because prudential considerations counsel against reaching the merits of Plaintiff's claims at this stage, the Court need not evaluate whether the suit presents a "purely legal" question.  This Circuit has previously held that courts should refrain from "intervening into matters that may best be reviewed at another time or in another setting," even if the issue presented is "purely legal" and "otherwise 'fit for review.'"  See Full Value Advisors, 633 F.3d at 1106 (quoting Louisiana Envtl. Action Network v. Browner, 87 F.3d 1379, 1382 (D.C. Cir. 1996) (internal quotation and citation omitted)).  Judicial restraint is particularly warranted where, as here, "the issue is one of constitutional import" and its "'uncertain nature … might affect a court's ability to decide intelligently."  Id. (citing Connecticut v. Duncan, 612 F.3d 107, 114 (2d Cir. 2010); La. Envtl. Action Network, 87 F.3d at 1382); see also Am. Compl., ¶¶ 132-80 (raising First Amendment claims).

  2.  *Hardship*

The only remaining question then is whether Plaintiff faces any hardship that would outweigh the Court's interest in deferring review until the agency's position on exemptions to the contraceptive-coverage requirement is settled.  See Vill. of Bensenville v. FAA, 376 F.3d 1114, 1119 (D.C. Cir. 2004) (courts must consider the "'hardship to the parties of withholding court consideration'") (quoting Abbott Laboratories, 387 U.S. at 149); see also Blanchette v. Conn. Gen. Ins. Corps., 419 U.S. 102, 138 (1974); Harris v. FAA, 353 F.3d 1006, 1011–12 (D.C. Cir. 2004).  In evaluating this consideration, courts are not to look to "direct hardship, but rather [to] whether postponing judicial review would impose an undue burden on [the parties] or would benefit the court."  Harris, 353 F.3d at 1012 (quotation marks omitted); see also Bensenville, 376 F.3d at 1120; AT&T Corp. v. FCC, 349 F.3d 692, 700 (D.C. Cir. 2003).

Plaintiff contends that postponing judicial review will impose a hardship because it must immediately begin planning for the possibility that it will be forced to give up its health insurance plan in 2014 (on account of its religious beliefs) and pay government fines.  See Opp. at 28 (citing Am. Compl., ¶¶ 3, 76, 92).  Costs stemming from Plaintiff's desire to prepare for contingencies are not sufficient, however, to constitute a hardship for purposes of the ripeness inquiry – particularly when the agency's promises and actions suggest the situation Plaintiff fears may not occur.  See Wilmac Corp. v. Bowen, 811 F.2d 809, 813 (3d Cir. 1987); Tennessee Gas Pipeline Co. v. FERC, 736 F.2d 747, 751 (D.C. Cir. 1984) (plaintiff's "planning insecurity" insufficient to establish hardship); Bethlehem Steel Corp. v. EPA, 536 F.2d 156, 162 (7th Cir. 1976) ("[C]laims of uncertainty in [plaintiff's] business and capital planning are not sufficient to warrant [] review of an ongoing administrative process.").

Plaintiff argues, in addition, that a delay in judicial review puts it at risk of third-party lawsuits, which the safe harbor does not bar.  See Opp. at 28-29.  While that may be true, the

theoretical possibility of future hardship arising from the Court's decision to withhold review until the agency's position is settled does not overcome the finding that the case is not yet "fit" for judicial resolution.  See Salvation Army v. Dep't of Cmty. Affairs of New Jersey, 919 F.2d 183, 193 (3d Cir. 1990) ("theoretical possibility of a suit against [plaintiff] by a program beneficiary" insufficient to establish jurisdiction).

At the end of the day, the Court offers no opinion on the merits of the current contraception-coverage regulations or any proposed future ones.  If Plaintiff is displeased by the ultimate regulations, it may certainly renew its suit at that time.  All the Court holds here is that Belmont has no basis to proceed now.

## IV.    Conclusion

For the foregoing reasons, the Court will issue a contemporaneous Order granting Defendants' Motion to Dismiss.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  July 18, 2012